**FILED**

2010 Apr-06  AM 10:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

AO 451  (Rev. 12/93)  Certification of Judgment

# UNITED STATES DISTRICT COURT

| EASTERN | DISTRICT OF | VIRGINIA - Richmond Division |

2010 MAR -8  A 10: 11

CFA Institute          U.S. DISTRICT COURT
                       N.D. OF ALABAMA
     V.

Institute of Chartered Financial
   Analysts of India

**CERTIFICATION OF JUDGMENT
FOR REGISTRATION IN
ANOTHER DISTRICT**

Case Number:   **3:98CV417**

I,                FERNANDO GALINDO               Clerk of the United States District Court certify that the

attached judgment is a true and correct copy of the original judgment entered in this action **Sept. 17, 2009** , as it
                                                                                                    Date

appears in the records of this court, and that

  See Final Order and Memorandum Opinion attached and Order

  granting plaintiff's Motion to Register.


**IN TESTIMONY WHEREOF,** I sign my name and affix the seal of this Court.


February 26, 2010                          FERNANDO GALINDO,  Clerk
     Date                                       Clerk

                                           _____
                                           (By) Deputy Clerk


*Insert the appropriate language: ..."no notice of appeal from this judgment has been filed, and no motion of any kind listed in Rule 4(a) of the Federal Rules of Appellate Procedure has been filed." ..."no notice of appeal from this judgment has been filed, and any motions of the kinds listed in Rule 4(a) of the Federal Rules of Appellate Procedure (†) have been disposed of, the latest order disposing of such a motion having been entered on [date]." ..."an appeal was taken from this judgment and the judgment was affirmed by mandate of the Court of Appeals issued on [date]. ..."an appeal was taken from this judgment and the appeal was dismissed by order entered on [date]."

(†Note: The motions listed in Rule 4(a), Fed. R. App. P., are motions: for judgment notwithstanding the verdict; to amend or make additional findings of fact; to alter or amend the judgment; for a new trial; and for an extension of time for filing a notice of appeal.)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

FEB 2 4 2010

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

CFA INSTITUTE,

                          Plaintiff.

v.

INSTITUTE OF CHARTERED FINANCIAL
ANALYSTS OF INDIA,

                          Defendant.

Civil Action Number 3:98CV417

## ORDER

THIS MATTER is before the Court on Plaintiff CFA Institute's Motion to Permit

Registration of the Court's September 16, 2009 Final Order.  (Doc. No. 127.)  Defendant Institute

of Chartered Financial Analysts of India has appealed the Final Order to the United States Court of

Appeals for the Fourth Circuit.  After hearing oral argument and pursuant to 28 U.S.C. § 1963, the

Court hereby GRANTS Plaintiff's Motion to Register.

      Let the Clerk send a copy of this Order to all counsel of record.

      And it is SO ORDERED.

_James R. Spencer_

CHIEF UNITED STATES DISTRICT JUDGE

ENTERED this 23rd day of February 2010

A TRUE COPY, TESTE:
CLERK, U.S. DISTRICT COURT

BY _____
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

SEP 1 7 2009

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

CFA INSTITUTE,

Plaintiff,

v.

INSTITUTE OF CHARTERED FINANCIAL
ANALYSTS OF INDIA,

Defendant.

Civil Action Number 3:98CV417

### FINAL ORDER

THIS MATTER is before the Court in reference to its Order dated March 30, 2009

(Docket No. 108) ("Contempt Order"), in which the Court found Defendant in Civil

Contempt of its 1998 Order.  Upon due consideration of the parties' briefing, and as stated

in the accompanying Memorandum Opinion, the Court awards Plaintiff treble damages in

the amount of $613,944.00 and attorney's fees in the amount of $444,554.16.

Let the Clerk send a copy of this Order to all parties of record.

It is SO ORDERED.

_____
CHIEF UNITED STATES DISTRICT JUDGE

Entered this ___16th___ day of September 2009

1

A TRUE COPY, TESTE:
CLERK, U.S. DISTRICT COURT

BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

SEP 1 7 2009

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

CFA INSTITUTE,

Plaintiff,

v.

INSTITUTE OF CHARTERED FINANCIAL
ANALYSTS OF INDIA,

Defendant.

Civil Action Number 3:98CV417

A TRUE COPY, TESTE:
CLERK, U.S. DISTRICT COURT
BY _____
DEPUTY

### ***MEMORANDUM OPINION***

THIS MATTER is before the Court in reference to its Order dated March 30, 2009

(Docket No. 108) ("Contempt Order"), in which the Court found Defendant in Civil

Contempt of its 1998 Order enjoining the use of certain prohibited marks, and directed the

parties to provide additional information relevant to the Court's fashioning of an appropriate

remedy. Upon due consideration of the parties' briefing, and in consideration of

Defendant's willful conduct, the Court awards Plaintiff treble damages in the amount of

$613,944 and attorney's fees in the amount of $444,554.16.

### I. BACKGROUND

On March 30, 2009, the Court entered a Contempt Order that required, inter alia:

(1) "Defendant, within thirty days, to submit to the Court . . . documentation informing the

Court of (a) the number of case studies sold in the United States and Canada by it or any of

its 'Constituent Units,' including but not limited to ICFAIAN, utilizing any Prohibited Marks

after it received the 1998 Order; (b) any income, including gross revenues, it received from

1



these sales; (c) the number of examinations conducted on behalf of it or any of its 'Constituent Units,'. . . in the United States or Canada after it received the 1998 Order; and (d) any income, including gross revenues, it received from administering, authorizing, or arranging for these examinations"; (2) "Plaintiff, within thirty days, to submit to the Court the 2004 Article to which it refers in its Post-Discovery Brief, any other documentation, and . . . the calculations it utilized to estimate Defendant's 2007 profits . . ."; and (3) "Plaintiff, within thirty days, to submit to the Court a brief detailing its calculation of reasonable attorneys' fees related solely to the Motion for Civil Contempt."[1]  Both parties have submitted the documentation requested by the Court.

In further response to the Contempt Order, Defendant has requested a hearing on the issue of the proper remedy for its contempt.  (Def.'s Mem. Opp'n Pl.'s Mot. Damages & Att'ys' Fees' 2, 16 (stating "Icfai further requests a hearing on this matter so that it can have an opportunity—for the first time since the litigation was instituted [twelve] years ago—to appear and defend itself.")  Nevertheless, this Court declines to hold a hearing on this matter as Defendant has not raised any issues upon which oral argument would further aid the Court in its determination, neither has Defendant stated any authority requiring this Court to hold a hearing.  See Fed. R. Civ. P. 78(b) (noting the court may determine motions on briefs, without oral hearings); Cf. E.D. Va. Loc. Adm. R. 7(J) ("In accordance with Fed. R. Civ. P. 78, the Court may rule upon motions without an oral hearing.").  Accordingly, this

---

[1]     The Contempt Order also granted Defendant's Motion to Strike Request for Discovery Sanctions, overruled Plaintiff's Objection to Improper Responsive Brief, and ordered Defendant to submit a report under oath within sixty days detailing its efforts to comply with the 1998 Order.  Contempt Order ¶¶ 5-7.

Court's determination is based on the pleadings.

## II. DISCUSSION

The appropriate remedy for civil contempt is within the Court's broad discretion. In re General Motors Corp., 61 F.3d 256, 259 (4th Cir. 1995). In its consideration, the Court may impose judicial sanctions either to coerce a party into compliance with the Court's Order, or to compensate the Movant for losses sustained, or both. United States v. United Mine Workers, 330 U.S. 258, 303-304 (1947). However, "the remedy and sanction for civil contempt must be remedial and compensatory, not punitive." In re Gen. Motors Corp., 61 F.3d at 259. In fashioning an appropriate form of relief, a district court may order payment of attorney's fees or disgorgement of profits. See In re Gen. Motors Corp., 110 F.3d 1003, 1019 (4th Cir. 1997) (stating "where a 'harm' amount is difficult to calculate, a court is wholly justified in requiring the party in contempt to disgorge any profits it may have received that resulted in whole or in part from the contemptuous conduct"); Folk v. Wallace Bus. Forms, Inc., 394 F.2d 240, 244 (4th Cir. 1968) (noting the court's right to award civil contempt damages, including attorney's fees). In the present matter, this Court finds disgorgement of profits and attorney's fees proper.

### A. Revenues Generated by Use of the Prohibited Marks

1. Revenues Based on the 2004 Article

Plaintiff's Post-Discovery Brief attempted to estimate Defendant's ill-gotten profits in an effort to determine an adequate damage amount. In short, Plaintiff's method of calculating Defendant's profits is dubious at best and at worst, an inappropriate means for determining relief in this matter. (See Mem. Op., at 31–32 (noting the Court's lack of

3

comfort with Plaintiff's requested $1.55 million sanction, calculated based upon a 2004

article on Defendant's founder).)  Specifically, Plaintiff requests this Court award damages in

the amount of $1.55 million based on an interview with Defendant's founder.  (Pl.'s Resp.

Contempt Order Ex. A ("Article").)  The Article states, "Last year revenues were in the

region of Rs 140 crore [roughly $31.2 million [2]], an impressive growth from Rs 30 crore just

five years back."  (Id.)  Plaintiff surmises that five percent of $31.2 million "yields a

conservative monetary sanction of $1.55 million," assuming Defendant's 2004 revenues

have remained flat since 2004.  (Id. at 3–4.)  Plaintiff states that it must use such a rough

methodology because Defendant has refused to provide discovery as to its revenues from

U.S. and Canadian activities, contravening the 1998 Order.  (Id. at 4.)  Moreover, Plaintiff

avers that courts have utilized such circumstantial evidence where Defendants have

intransigently refused to provide discovery that would provide more precise information.

(Id. (citing Intel Corp. v. Terabyte Int'l, Inc., 6 F.3d 614, 621 (9th Cir. 1993); Wesco Mfg.,

Inc. v. Tropical Attractions of Palm Beach, Inc., 833 F.2d 1484, 1488 (11th Cir. 1987);

Louis Vuitton S.A. v. Spencer Handbags Corp., 765 F.2d 966, 972–73 (2d Cir. 1985);

Universal Furniture Int'l, Inc. v. Collezione Europa, USA, Inc., 599 F. Supp. 2d 648, 660–61

---

[2]

      Plaintiff previously calculated Defendant's revenue at $35 million, but now
acknowledges it used the incorrect year's conversion rate.  (Pl.'s Resp. Contempt Order 2
n.1; cf. Pl.'s Post-Disc. Br. 36.)  Plaintiff reaches the revised figure of $31.2 million based on
the fact a "crore" means "10 million," so Rs 140 crore equals Rs 1,400,000,000.  One
billion four hundred million multiplied by the 2004 conversion rate of 0.0222519 yields
$31,152,660.00.  (See Pl.'s Resp. Contempt Order 2.)  According to Plaintiff, the Rs 30
crore figure the article cites for Defendant's 1999 revenues therefore equals roughly $6.9
million.

(M.D.N.C. 2009); Aris Isotoner, Inc. v. Dong Jin Trading Co., No. 87-CV-890, 1989 WL
236526, at **6–7 (S.D.N.Y. Sep. 22, 1989); Chesa Int'l, Ltd. v. Fashion Assoc., Inc., 425 F.
Supp. 234, 238 (S.D.N.Y. 1977), aff'd 573 F.2d 1288 (2d Cir. 1977)).) Thus, Plaintiff urges
the Court to award it the $1.55 million figure to which it arrives by taking five percent of
Defendant's revenues for the year 2004.

Defendant strenuously objects to Plaintiff's methodology. (Def.'s Opp'n Pl.'s Mot.
Damages & Att'ys' Fees 2–4.) Defendant claims the Article is impermissible hearsay that
discusses a university network in India that did not use the Prohibited Marks in the United
States or Canada. Moreover, Defendant points out that Plaintiff never attempted to resolve
the discovery disputes and, more importantly, the issue for discovery was whether a basis for
the motion for contempt existed. As a result, Defendant argues that Plaintiff cannot now
claim intransigence on Defendant's part because Plaintiff sought discovery regarding
revenues prematurely.

Defendant's arguments are persuasive. Without reaching the evidentiary issue, the
Article does not provide a firm means by which to determine the amount of Defendant's
revenues earned through the use of the Prohibited Marks in the United States or Canada.
The Article does not mention the United States or Canada and seems primarily focused on
growth of ICFAI University in India. See Article (discussing "50,000 students from all over
India pursuing various campus-based or distance learning programmes"; "talks with 16
[Indian] state governments" in order to set up campuses; and a new campus in
Shankerpally). Defendant argues the remedy the Court should fashion for Defendant's
contempt violation should countenance revenues obtained as a result of Defendant's

5

contempt, not its revenues in general.  See United Mine Workers, 517 F.2d at 1349; cf.

Universal Furniture, 599 F. Supp. 2d at 653-54 ("Gross revenue is calculated only as to 'the

gross revenue for the infringer's line of business or project related to the infringement,' and

not the 'infringer's gross revenue from all of its commercial endeavors.'") (quoting Nelson-

Salabes, Inc. v. Morningside Dev., 284 F.3d 505, 512 n.9 (4th Cir. 2002)).  Defendant is

correct, the revenue referenced in the 2004 article is far too attenuated to be an adequate

basis for this Court to determine sanctions upon.  Thus, this Court rejects Plaintiff's $1.55

million proposed damages amount and declines to use this revenue calculation as a basis for

its relief determination.

2.     Data Provided by Defendant

        In response to the Contempt Order, Defendant has provided data identifying the

revenues it earned in contravention of the Injunction by selling case studies, books, and

magazines; offering examinations; and fostering business associations with entities in the

United States and Canada using the Prohibited Marks.  (Def.'s Opp'n Pl.'s Mot. Damages &

Att'ys' Fees Exs. A-B.)  This amount totals $204,648; $140,773 for the sale of case studies,

books, and magazines, and $63,875 for examinations.  Absent any indication that

Defendant has been less than honest with the Court, this figure represents a firmer basis in

fact than the $1.55 million figure Plaintiff derived from the Article.

        Plaintiff, however, maintains this figure fails to identify all of Defendant's ill-gotten

gains because the Court did not require Defendant to submit data regarding the revenue it

earned from offering online and distance learning courses.  (Pl.'s Resp. Contempt Order 4

n.4.)  However, Plaintiff devoted less than a page in its Post-Discovery Brief to the issue of

6

distance learning, so it seems inconsistent for Plaintiff to now claim "fees for in-person and on-line courses represent perhaps the major component of ICFAI's revenues." (Compare Pl.'s Post-Disc. Br. 21 (discussing a student located in the United States taking courses from ICFAI via its Web Site) with Pl.'s Resp. Contempt Order 4 n.4.)

Moreover, with regard to the $204,648 figure, Defendant suggests the Court should take into account the costs associated with producing the infringing literature and offering the infringing examinations. (Def.'s Mem. Opp'n Pl.'s Mot. Damages & Att'ys' Fees 4.) According to Defendant, incorporating these costs would demonstrate a "net loss" from its use of the Prohibited Marks. (Id. 4; Supplemental Decl. of E.N. Murthy & Exs. A-E.) However, Defendant does not report expenditures specific to the United States or Canada, but rather reports them in the aggregate across Defendant's Constituent Units. (See Murthy Decl. Ex. D.) As such, the exhibits do not demonstrate any specific "net loss" as related to the particular revenues at issue for the determination of a proper contempt remedy. Accordingly, the Court rejects this contention.

Plaintiff's final contentions relate to the Court's potential reliance on the numbers stated by Defendant. Plaintiff contends, "[R]elying on ICFAI to self-report its ill-gotten revenues is akin to relying on the fox to report the number of chickens that it obtained from the henhouse." (Pl.'s Reply 7.) While this Court recognizes the potential for Defendants to misstate its revenue, the Court is satisfied with the numbers Defendant has provided and therefore finds actual damages in the amount of $204,648.

3.    Treble Damages

In its Reply brief, Plaintiff states the Court should treble the $204,648 damages figure

(resulting in a damages award of $613,944), if it is inclined to reject the $1.55 million figure proposed. (Pl.'s Reply 3.) The authority to which it points is § 35 of the Lanham Act, 15 U.S.C. § 1117 (2006).

Section 35 of the Lanham Act gives the Court discretion to compensate a plaintiff whose mark has been infringed by awarding the plaintiff any profits the defendant earned, any damages sustained, and the costs of a cause of action resulting from the infringement, including reasonable attorneys' fees. § 1117(a). This section also provides,

> In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, *not exceeding three times such amount*. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive *the court may in its discretion enter judgment for such sum as the court shall find to be just*, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

§ 1117(a)(3) (emphasis added). Accordingly, Congress has given the Court great discretion in awarding a damages remedy where a violation of the Lanham Act has occurred, and Congress has deemed an award of a penalty the Court finds "just" as compensatory, *not* punitive. See id.; cf. In re Gen. Motors Corp., 61 F.3d at 259 ("[T]he remedy and sanction for civil contempt must be remedial and compensatory, not punitive.").

Here, Defendant's actions in contempt of the 1998 Injunction also constitutes violations of the Lanham Act—the initial reason the Court issued the 1998 Injunction—which the Court found to be willfully committed over the course of nearly a decade. (See Mem. Op. at 33.) Accordingly, this Court will treble its actual damage award of $204,648, resulting in a total damages award of $613,944. The Court finds this amount adequate but not excessive, and a just representation of the compensation due to Plaintiff by virtue of Defendant's

8

disobedience of the 1998 Order.

### B. Attorneys' Fees and Costs

Although the decision whether to award attorneys' fees is a matter within the court's

discretion, the court must consider and make detailed findings of fact with respect to twelve

factors when determining the appropriate amount of the award:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions
> raised; (3) the skill required to properly perform the legal services rendered; (4)
> the attorney's opportunity costs in pressing the instant litigation; (5) the
> customary fee for like work; (6) the attorney's expectations at the outset of the
> litigation; (7) the time limitations imposed by the client or circumstances; (8)
> the amount in controversy and the results obtained; (9) the experience,
> reputation and ability of the attorney; (10) the undesirability of the case within
> the legal community in which the suit arose; (11) the nature and length of the
> professional relationship between attorney and client; and (12) attorneys' fees
> awards in similar cases.

Barber v. Kimbrell's, Inc., 577 F.2d 216, 226, 226 n.28 (4th Cir. 1978) (citing Johnson v.

Ga. Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974)).  Guided by these factors, the

court determines how many hours were reasonably spent on the litigation of the Motion for

Civil Contempt and the rate at which that work should be compensated.  See McDonnell v.

Miller Oil Co., 134 F.3d 638, 640 (4th Cir. 1998).[3]

Relying on the Johnson factors cited in Barber, Plaintiff reaches a final figure of

$444,554.16 for fees and costs for the work completed by Hunton & Williams LLP

("H&W").  This total consists of attorneys' fees in the amount of $432,405.54 based upon a

---

[3]      This Memorandum discusses the twelve factors under these two considerations:  (1) time
reasonably spent on litigating the Motion for Civil Contempt and (2) the reasonable rate for that
time.

total of 1,182.16 hours kept by timekeepers assigned to the case, and $12,148.62 for costs.[4]
The Court finds these fees reasonable and appropriate.

1.    Hours Reasonably Spent on the Litigation of the Motion

Plaintiff claims counsel spent a total of 1,182.16 hours on work related to the Motion

for Contempt, with the total hours divided among task categories as follows:  (1) 92.78 for

"Motion Prep"; (2) 879.66 for "Discovery"; (3) 202.20 for "Post-Discovery Brief Prep"; and

(4) 7.52 for "Court Order Response."  (Pl.'s Resp. Mot. Contempt 13.)  Plaintiff also

delineates hours by "Timekeeper" for the following nine individuals including partners,

associates, paralegals, and litigation support personnel:  (1) 471.64 hours for partner Stephen

Demm ("Demm"); (2) 331.50 hours for associate William Wright ("Wright"); (3) 34.29 for

partner W. Jeffrey Edwards ("Edwards"); (4) 40.75 hours for associate J.W. Cho ("Cho");

(5) 32.00 hours for associate E.M. Updike ("Updike"); (6) 149.23 hours for paralegal S.E.

Meharg ("Meharg"); (7) 79.75 hours for paralegal M.B. Sweazy ("Sweazy"); (8) 25.25 hours

for paralegal P.A. Slayton ("Slayton"); and (9) 17.75 hours for litigation support person E.V.

Christensen ("Christensen").  (Id.)

Notwithstanding Defendant's argument to the contrary, the number of hours Plaintiff

alleges to have spent related to the Motion for Contempt appears to be reasonable.

---

[4]    Defendant incorrectly states Plaintiff does not address all of the Johnson factors.  (See
Def.'s Mem. Opp'n Pl.'s Mot. Damages & Att'ys' Fees 12–15.)  However, this Court notes that
Plaintiff has adequately addressed all twelve factors.  (See Pl.'s Resp. Mot. Contempt 13-25;
Pl.'s Reply Mot. Contempt 6-8.)

a.    *Time and Labor Expended*

The specific tasks resulting in the 1,182.16 hours Plaintiff claims include:  (1) filing and

briefing the motion to show cause (193 pages including exhibits); (2) filing and briefing two

discovery motions (86 pages including exhibits); (3) taking oral and written depositions

(1,060 pages resulting including exhibits); (4) defending four oral depositions (1,014 pages

resulting including exhibits); (5) serving Defendant three sets of document requests (1,176

pages); (6) serving Defendant sixteen interrogatories and thirty-four requests for admissions;

(7) serving two third-party subpoenas (490 pages); (8) serving Defendant answers to twenty

interrogatories; (9) serving Defendant responses to two sets of document requests (715

pages); (10) exchanging among counsel twelve letters regarding discovery disputes (57 pages

including exhibits); and (11) filing the Post-Discovery brief (1,283 pages including exhibits).

(Pl.'s Resp. Contempt Order 20 (citing Decl. of Demm ¶ 7).)  According to Plaintiff, H&W

leanly staffed this work relying primarily on two attorneys, Demm and Wright, and a

paralegal, Meharg.  Various attorneys, most billing at lower rates, and paralegals offered

support where required.  (Id. at 21–22.)  Despite Plaintiff's contentions, Defendant challenges

Plaintiff's determinations.

1)    *The Motion to Stay Is "Related to" the Motion for Contempt*

As an initial matter, Defendant challenges Plaintiff's contentions that the Motion to

Stay Enforcement of Injunction, filed October 12, 2007, is related to the Motion for

Contempt.  Defendant argues the Court should exclude all fees Plaintiff included potentially

related to the Motion to Stay.  (Def.'s Mem. Opp'n Pl.'s Mot. Damages & Att'ys' Fees 11–12.)

Defendant bases its argument on the language of the Contempt Order which ordered

11

"Plaintiff, within thirty days, to submit to the Court a brief detailing its calculation of reasonable attorneys' fees related solely to the Motion for Civil Contempt." (Contempt Order ¶ 4.) According to Defendant, the language "related solely to the Motion for Civil Contempt" self-evidently excludes compensation for time entries related to the Motion for Stay—even where the work on the two motions coincided. Defendant primarily contests half of 7.5 hours resulting in a charge of $1,732.50, four pages of Plaintiff's Post-Discovery Brief, and, because Defendant devoted twenty-five of its twenty-nine pages to the Motion for Stay, 86% of the time Plaintiff spent reviewing and reacting to Defendant's Post-Discovery Brief. (See id.; cf. Pl.'s Resp. Contempt Order Ex. O.) However, this Court finds that Plaintiff properly included the time entries for work that combined the Motion to Stay and the Motion for Contempt in its fees application due to the fact that the Motion for Stay was intertwined with, and thus "related to," the Motion for Contempt. In fact, the Motion to Stay seems to have been a response to Plaintiff's Motion for Contempt filed September 27, 2007. (See, e.g., Def.'s Mem. Supp. Mot. Stay 1 ("[O]nly *days* after defendant . . . noticed its appeal, plaintiff . . . now files a motion to have Defendant held in contempt. . . . In light of Plaintiff's attempt to unduly expand and misapply the 1998 Injunction, Defendant seeks to stay enforcement of that Injunction pending Defendant's appeal.").)

Additionally, as Plaintiffs aver, the facts relevant to the Motion to Stay and those relevant to the Motion for Contempt overlap. Specifically, the issues of whether Defendant's activities violated the Injunction and whether those activities, if in contravention of the Injunction, caused Plaintiff harm played a central role in both the Motion for Contempt and the Motion to Stay. Moreover, a determination of the public interest played a significant role

12

in the resolution of both Motions.  Further, Defendant's own Post-Discovery Brief bears out

the interrelation of the two motions, for although Defendant claims to have devoted the

majority of its Post-Discovery Brief to the Motion for Stay, a review of the document,

notwithstanding the given headings, reveals that a majority of the document contains facts or

background information and argument that the Court could have considered for both the

Motion for Stay and the Motion for Contempt.  (See, e.g., Def.'s Post-Disc. Br. 1—3, 8–9,

12–20, 22, 25–28).  Accordingly, the Court is satisfied with Plaintiff's limited inclusion of

work for the Motion to Stay in its calculation, and has no cause to doubt Plaintiff's counsel's

honesty in its stated determination of hours.  (See Pl.'s Reply Contempt Order 3–4 ("CFA

Institute has excluded from its requested fees any time entries that identified the motion to

stay but did not identify the contempt motion"); Pl.'s Resp. Contempt Order 8–9 ("If a fee

entry expressly mentioned the motion to stay, but not the motion to show cause, it was not

marked for inclusion.").)

### 2)   Defendant's Other Objections

In addition to Defendant's first objection, Defendant also objects to (1) the 92 hours

claimed for work done in September 2007 on the Motion for Contempt, which it has called

duplicative based upon earlier work on that Motion in January and February 2007, and

requests a reduction to 30 hours at the "blended rate"[5] (Def.'s Opp'n Pl.'s Mot. Damages &

Att'ys' Fees 6–7); (2) the 879.66 hours claimed for work on discovery, which it avers

impermissibly includes work for the Motion to Stay and demonstrates "overbilling and double

---

[5]   The "blended rate" ostensibly refers to the "Total Average Rate" identified in Plaintiff's
brief that takes into account the average of the billing rates of all the attorneys and paralegal
staff, which has increased over time.  (Pl.'s Resp. Contempt Order 13.)

13

billing" and requests this figure be reduced to 175 hours at the "blended rate" (Id. at 8–10); and (3) the 202.20 hours claimed for work on the Post-Discovery Brief, which it claims are unreasonable because it was "a brief with which [counsel] were intimately familiar and had already written twice" and requests this number be reduced to 50 hours at the "blended rate" (Id. at 11).  Based upon these objections, Defendant requests the Court reduce any award for attorneys' fees and costs to $93,258.58.[6]

    Defendant's arguments regarding hours relies heavily on the length of briefs or other documents as evidence that counsel overbilled for some tasks.  (See id. at 6 ("[T]he opening brief was only ten pages long and the reply brief was only 15 pages longs"), 9 ("Mr. Demm's 40 hours of preparation were excessive given that Icfai's document production at that time totaled only 1,160 pages"), 10 (arguing fifteen-page memorandum replying to a motion to quash was excessive); but see id. at 6 (arguing much of the work for original contempt motion had already been completed earlier in 2007 and no new facts had subsequently arisen).)  Although, the length of the documents being written or reviewed may be instructive as to the reasonableness of the hours spent thereon, it is unclear that the examples raised by Defendant demonstrate any unreasonableness on the part of Plaintiff's counsel.  Indeed, reducing the length of a brief in the interest of conciseness may take significant time and thought.

    Defendant also avers Plaintiff's counsel overstated hours because multiple attorneys worked on briefs, reviewed documents, or prepared for depositions; this, according to Defendant, constitutes billing for duplicate work.  (Def.'s Mem. Opp'n Pl.'s Mot. Damages &

---

[6]    Defendant does not explicitly challenge the costs calculation of $12,148.62.

Att'ys' Fees 10). (See id. at 8 ("Messrs. Demm and Edwards . . . also spent numerous hours

. . . reviewing the same requests on the same day and back to back days."), 8 ("[T]here are

11 separate entries among 3 attorneys about how to respond to . . . objections [to discovery

requests]."), 9 ("Mr. Demm spent nearly 40 hours preparing for the deposition of Subrash

Sarnikar . . . , his paralegal and Mr. Wright had already jointly prepared an index of that

production and Mr. Wright had already reviewed the documents."), 10 ("Mr. Wright spent

25.75 [hours] drafting two motions to quash . . . .  In addition, Mr. Demm spent some part of

11.5 hours working on these same motions."), 10 ("Mr. Wright spent 22.75 hours working on

[the Motion to Quash] reply brief, while Ms. Cho spent 26.75 hours performing related

research, and Mr. Demm spent some portion of 20 hours working on the same motion. . .

.").)

Contrary to Defendant's contention, it is not unusual or unreasonable that more than

one attorney would help draft, review, or conduct research related to drafting or reviewing a

particular filing with the Court.  Without any specific reason to believe otherwise, these

exemplars seem to suggest nothing more than collaboration among the litigation team about

the various issues that arose in the course of the Motion for Contempt.

> b.   *Novelty and Difficulty of the Questions Raised*

It is clear that the issues raised by the Motion for Contempt were not novel.  However,

Plaintiff claims Defendant's behavior during discovery made the work related to the motion

more difficult.  (Id. at 22.)  Plaintiff argues that it provided the majority of the documents

produced during discovery, although the pertinent question was Defendant's conduct.

Moreover, Plaintiff states that it incurred additional expenses defending against Defendant's

requests for discovery outside the scope of that granted by the Court.  Though Plaintiff may

be correct regarding the amount of time expended, it does not appear that Plaintiff in fact

faced any difficulty *with the questions* raised, even though it faced some difficulty navigating

discovery production and disputes with Defendant. Therefore, this factor does not weigh in

Plaintiff's favor.

        c.      *Attorneys' Expectations at the Outset of the Litigation*

        Plaintiff states that it and H&W agreed from the onset that H&W would represent it at

hourly rates based upon the assigned attorneys' experience and expertise.  Plaintiff and

H&W also agreed upon rates below those normally charged for the attorneys assigned to the

case.  Plaintiff paid H&W based on the agreed-upon fee schedule.  Defendant does not

address this factor.[7]   Nevertheless, this factor considers whether or not the amount of time

expended on the litigation matched what counsel and client expected when embarking upon

the litigation—not what rates would be charged and paid.  Thus, this factor does not weigh in

Plaintiff's favor.

        d.      *Time Limitations Imposed by the Client or Circumstances*

        According to Plaintiff, the Court's deadlines required it "to move with dispatch in

propounding and responding to discovery," so it "engag[ed] additional H&W personnel to

perform research and review hard copy and electronic documents."  (Pl.'s Resp. Contempt

Order 24.)  The work of the additional attorneys, paralegals, and litigation support personnel

enabled it to meet those deadlines.  Plaintiff's submitted hours are consistent with this

---

[7]     In fact, Defendant erroneously accuses Plaintiff of failing to address this factor.  (See
Def.'s Mem. Opp'n Pl.'s Mot. Damages & Att'ys' Fees 13; cf. Pl.'s Resp. Contempt Order 13-
14.)

statement and therefore the Court finds this factor weighs in its favor.

In summary, an overall view of the relevant <u>Johnson</u> factors demonstrates the hours

expended related to the Motion for Contempt do not appear to be unreasonable.

2.    <u>Reasonable Rate at which the Work Should Be Compensated</u>

In order to account for rate increases over the course of the litigation, Plaintiff

identifies the rates charged by various timekeepers as an "average rate" figure which derives

from "dividing the total fees charged per attorney by the total hours billed by that attorney."

Plaintiff identifies the following rates per hour:  (1) $493.04 for Demm; (2) $372.38 for

Wright; (3) $532.00 for Edwards; (4) $231.00 for Cho; (5) $195.00 for Updike; (6) $150.00

for Meharg; (7) $150.00 for Sweazey; (8) $173.66 for Slayton; and (9) $213.94 for

Christensen.  (Pl.'s Resp. Contempt Order 13.)  Plaintiff states that the rates charged by

Demm, Wright, and Edwards constitute reduced rates at 15-25% below their standard fees.

Defendant concedes, and the Court agrees, that these rates are reasonable.  (<u>See</u> Def.'s Mem.

Opp'n Pl.'s Mot. Damages & Att'ys' Fees 13.)

a.    *Skill Required to Properly Perform the Legal Services Rendered*

Plaintiff points to the specialized area of trademark law underlying this litigation and

both parties' use of "large national law firms" able to navigate "the worldwide location of

witnesses and deponents, and . . . the worldwide dispute between these parties," including

proceedings before this Court, the U.S. Patent and Trademark Office ("PTO"), and various

courts and government agencies in India. (Pl.'s Resp. Contempt Order 13–14.)  Plaintiff also

identifies H&W's "knowledge of [CFA's] business, including the importance of protecting the

CFA brand and other trademarks at issue here" and "specific knowledge of issues regarding

17

ICFAI and its activities in the U.S." which allowed H&W "to pursue a 'meticulous approach to research and analysis,' submit 'clear and concise pleadings,' and otherwise offer thorough, professional representation."  (Id. at 14.)

Defendant argues that H&W's familiarity with the factual and legal issues should have enabled Plaintiff's counsel "to offer streamlined, efficient services."  (Def.'s Mem. Opp'n Pl.'s Mot. Damages & Att'ys' Fees 13.)  In its view, H&W's familiarity with the issues "fundamentally contradicts" Plaintiff's fee application and demonstrates that H&W engaged in "duplicative and unnecessary work."  (Id.)

Defendant's argument, however, misses the point.  The question here is what skills were required to provide the legal services necessary to pursue the Motion for Contempt. H&W's familiarity with the legal and factual issues does not negate the skill the attorneys brought to bear in pursuing the motion—as Defendant suggests.  As Defendant admits, H&W's counsel possessed the competency and qualifications to handle the instant dispute. (Def.'s Mem. Opp'n Pl.'s Mot. Damages & Att'ys' Fees 15.)  As such, the Court finds this factor weighs in Plaintiff's favor.

        *b.*    *Attorneys' Opportunity Costs in Pressing the Instant Litigation*

Plaintiff admits that H&W likely did not forego any legal work at higher rates in order to pursue this litigation.  (Pl.'s Resp. Contempt Order 15.)  Thus, its opportunity cost equals the hourly rates H&W actually charged Plaintiff.  (Id.)  The Court agrees with Defendant that this favor does not weigh in Plaintiff's favor.

        *c.*    *Customary Fee for Like Work*

18

Plaintiff avers H&W's rates are commensurate with rates charged by attorneys at national law firms in the Richmond market. They support this contention with a declaration from Dabney J. Carr ("Carr"), a partner at Troutman Sanders in Richmond who charges rates similar to those Demm charged Plaintiff. (Pl.'s Resp. Contempt Order 15 (citing Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 179 (4th Cir. 1994) ("The relevant market for determining the prevailing rate is ordinarily the community in which the court where the action is prosecuted sits."); Decl. of Dabney Carr ¶¶ 14, 16, 18–23.) According to Carr, the rates charged by H&W for the various experience and expertise level of the personnel working on this litigation mirrors the rates charged by his firm for similar personnel. (Decl. of Dabney Carr ¶¶ 14, 16, 18–23.)

Defendant does not challenge the rates charged by H&W's attorneys. (Def.'s Mem. Opp'n Pl.'s Mot. Damages & Att'ys' Fees 13.) Accordingly, and because affidavits from attorneys in the relevant market may serve as evidence of market rates, Spell v. McDaniel, 824 F.2d 1380, 1402 (4th Cir. 1987), this factor weighs in Plaintiff's favor.

d.     *Amount in Controversy and the Results Obtained*

Plaintiff states this factor strongly weighs in its favor because the Court "complete[ly] vindicat[ed]" its right to "very valuable trademarks . . . critical to its continued prosperity." (Pl.'s Resp. Contempt Order 16.) Relying on Farrar v. Hobby, 506 U.S. 103, 114 (1992), Plaintiff states that this is the "most critical factor" in determining the reasonableness of a fee award. (Pl.'s Resp. Contempt Order 16.)

Defendant states that Plaintiff is confused regarding the relevant amount in controversy for the contempt motion. It states that $204,648, a figure less than half of the fee

19

award it seeks, represents the true "amount in controversy." (Def.'s Mem. Opp'n Pl.'s Mot. Damages & Att'ys' Fees 14.) Unreasonably expending $444,544.16, the amount Plaintiff claims it spent in attorneys' fees, in pursuit of "some percentage" of the revenues gained from the infringing behavior, according to Defendant, should preclude an award of the fees requested. (Id. (citing DIRECTV, Inc. v. Carrera, 2005 U.S. Dist. LEXIS 20963, at **8–9 (W.D. Va. Sep. 22, 2005)).)

Defendant's argument lacks persuasiveness. First, Defendant's contempt necessary implicates the good will Plaintiff possessed in its trademarks because the contemptuous behavior amounted to infringement. Thus, the amount in controversy includes more than the revenues Defendant self-reported. Second, Defendant cannot rely on a figure it reported to the Court after it was found in contempt to argue that efforts in pursuit of the Motion for Contempt were exorbitant. Plaintiff could not have known the extent of Defendant's ill-gotten gains without pursuing discovery on the issue. The Court had to order Defendant to provide this information. Accordingly, this factor weighs in Plaintiff's favor.

e.   *Experience, Reputation, and Ability of the Attorneys*

Plaintiff states that the primary attorneys providing it representation, Edwards, Demm, and Wright, each possess twenty or more years of experience in law practice engaging in "complex, often discovery-intensive, litigation." (Pl.'s Resp. Contempt Order 17.) Demm, Plaintiff notes in particular, maintains a specialized practice related to trademark and intellectual property. (Id.) As Defendant does not challenge the above representations, this factor benefits Plaintiff.

20

     f.     *Undesirability of the Case within the Legal Community in which the Suit Arose*

Neither party contends this was an undesirable case in the legal community and thus this factor does not benefit Plaintiff.

     g.     *Nature and Length of the Professional Relationship between Attorneys and Client*

Plaintiff notes that H&W has served as its outside counsel for approximately five years and has developed "a close working relationship with its counterparts in CFA Institute's office of general counsel." (Pl.'s Resp. Contempt Order 18.) Plaintiff initially contacted Edwards in August 2005 regarding testing at Indian consulates it considered violations of the 1998 Injunction. (Id.) The work completed by Edwards led these consulates to cease housing the tests. (Id.) Thus, Plaintiff submits, H&W played a key role in its "efforts to enforce the 1998 Injunction for a substantial time before the show cause motion was filed." (Id.) These facts tip this factor in its favor, Plaintiff avers.

Defendant, however, states that H&W's relationship was limited to defense of its motion to vacate and such menial involvement "does not support an award of the exorbitant fees demanded by CFA Institute." (Def.'s Mem. Opp'n Pl.'s Mot. Damages & Att'ys' Fees 15.) Defendant has not presented any information that rebuts the fact that H&W has had a close working relationship on the instant litigation for approximately five years. Thus, this factor weighs in Plaintiff's favor.

h.    *Attorneys' Fees Awards in Similar Cases*[8]

Plaintiff points the Court's attention to cases in this Circuit where the court approved a

top hourly rate of $500 with a total award of $427,074, White v. BFI Waste Servs., LLC; an

award of 90% of attorneys' fees for work of partners, associates, and legal assistants from

Troutman Sanders LLP for $641,595, Corinthian Mortgage Corp. v. Choicepoint Precision

Marketing, LLC, No. 1:07-CV-832, 2009 WL 36606 (E.D. Va. Jan. 5, 2009); a $3 million

award in a patent case in which a losing party committed inappropriate conduct before the

PTO, Synthon IP, Inc. v. Pfizer Inc., 484 F. Supp. 2d 437, 446 (E.D. Va. 2007); a top hourly

rate of $475 for H&W attorneys, In re Fas-Mart Convenience Stores, Inc., No. 01-60386-

DOT; and a $310 hourly rate for an H&W associate with nine years' experience, United

States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337 (4th Cir. 2009).  These cases, according to

Plaintiff, demonstrate the reasonableness of Edwards's $532, Demm's $493, Wright's $372,

Cho's $231, and Updike's $195 hourly rates.

The Court finds these factors demonstrate the reasonableness of the rate H&W

charged Plaintiff.  Also, the fact that Plaintiff actually paid these rates weighs in favor of

granting the fees requested.  See Rum Creek Coal Sales, Inc v. Caperton, 31 F.3d 169, 175

(4th Cir. 1994) ("While evidence of fees paid to attorneys of comparable skill in similar

circumstances is relevant, so too is the rate actually charged by the petitioning attorneys when

it is shown that they have collected those rates in the past from the client.") (citing Gusman v.

---

[8]    Plaintiff discusses this factor as a part of its reasonable hours analysis (Pl.'s Resp.
Contempt Order 24-25), adopting the approach taken by Trimper v. City of Norfolk, 846 F.
Supp. 1295, 1304 (E.D. Va. 1994), but the factor—relevant to both categories—seems more
suited to the reasonable rate discussion and is thus discussed here.

Unisys Corp., 986 F.2d 1146 (7th Cir.1993)); accord Schmidt v. Citibank (South Dakota),

N.A., No. 1:08-CV-165, 2009 WL 975379, at *9 (E.D. Va. Apr. 10, 2009) ("In the Fourth

Circuit, the rates actually charged by a petitioning attorney are evidence of reasonableness

when it is shown that they have collected those rates in the past from the client.").

Therefore, the Court finds the rates charged by H&W attorneys reasonable. Further,

as Defendants have not challenged Plaintiff's determination of costs, this Court only briefly

notes that Plaintiff's costs determinations are also reasonable.

IV. CONCLUSION

For the reasons discussed above, the Court: (1) FINDS damages in the amount of

$613,944, trebling the demonstrated revenues Defendant gained in contravention of the

1998 Injunction and rejecting Plaintiff's $1.55 million proposed damages, and (2) GRANTS

Plaintiff's application for attorneys' fees and costs in the amount of $444,554.16 to consist of

$432,405.54 based upon a total of 1,182.16 hours kept by timekeepers assigned to the case,

and $12,148.62 for costs.

It will be SO ORDERED.

_James R. Spencer_
CHIEF UNITED STATES DISTRICT JUDGE

ENTERED this __ day of September 2009

23